## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EBONE CLEMENTS | : | CIVIL ACTION |
| | : | |
| V. | : | |
| | : | |
| PEIRCE-PHELPS, INC. | : | NO: 2:12-cv-06897 |

### MEMORANDUM OPINION

**Goldberg, J.**                                                                                          **July 2, 2014**

Plaintiff, Ebone Clements, alleges that Defendant, Peirce-Phelps, Inc. racially discriminated against her by paying her lower wages than a white employee in violation of Title VII of the Civil Rights Act of 1964[1] (hereinafter "Title VII") and the Civil Rights Act of 1991[2] (hereinafter "§ 1981").[3] Plaintiff's basic contention is she was treated less favorably than a white, male employee in her transition from a non-union to a union position within the company.

Before the Court is Defendant's motion for summary judgment. We will grant Defendant's motion because Plaintiff has failed to adduce sufficient evidence to allow a jury to conclude that Peirce-Phelps' proffered explanation regarding her pay rate (an informal agreement within the union) was pretextual.

## I.    FACTUAL AND PROCEDURAL HISTORY[4]

Plaintiff, an African American woman, was hired in September, 2003 to a non-union position as a Warehouse Associate at "Branch 16," a Peirce-Phelps warehouse on Decatur Road

---

[1] As amended, 24 U.S.C. §§ 2000e, et. seq.

[2] 42 U.S.C §1981

[3] Plaintiff also brings a claim pursuant to Pennsylvania Human Relations Act, 43 P.S. § 955(a) et. seq. ("PHRA").

[4] Unless otherwise indicated, the facts discussed are undisputed.

in Philadelphia. (Def.'s Stat. of Facts ¶ 2; Pl.'s Resp. in Opp., p. 2.) At the time Plaintiff was hired, her hourly salary was approximately $10.00 per hour, or $20,800 annually. Plaintiff was promoted to another non-union position, forklift operator, on December 16, 2003 and between then and September 9, 2005, she received several pay increases which ultimately raised her hourly rate to $13.00 per hour, the equivalent of an annual rate of $27,040. (Def.'s Stat. of Facts ¶¶ 3–5.)

In 2005, Peirce-Phelps posted a position for a night shift forklift operator at their warehouse located at 59th street, and Plaintiff approached her supervisor, Mike Panara, about the position. (Def.'s Stat. of Facts ¶ 6.) The 59th street warehouse is a union organized warehouse that has a Collective Bargaining Agreement (hereinafter "CBA") with Local 169, (affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America) that governs unionized workers' employment, paid vacation, pay-scale, and seniority. (Def.'s Stat. of Facts ¶ 7.) As of 2005, Article III of the CBA provided that new employees would receive hourly wages according to the following:

| To Start | $10.00 |
|---|---|
| After 3 Months | $10.50 |
| After 6 Months | $11.00 |
| After 12 Months | $11.50 |
| After 18 Months | $12.00 |
| After 2 Years | Parity |

(Def.'s Stat. of Facts ¶ 8.) The "parity" rate was the top hourly rate available for a given position, and was set out in various schedules attached to the CBA. (Def.'s Stat. of Facts ¶ 9.) Once an employee starts working at the union organized warehouse, he or she is placed on a seniority list in consecutive order based on their start date in the union position. (Id.)  This means that each employee is placed in line to receive sequential increases in pay rate in accordance with Article III until he or she makes parity. (Def.'s Stat. of Facts ¶¶ 8-9.)

After Plaintiff expressed an interest in the 59th street warehouse, the distribution manager for that facility, Joe Scherer, informed her that she would have to join the union and take a temporary pay cut if she were to accept the position. (Def.'s Stat. of Facts ¶ 10.) At the time of her request, Plaintiff's non-union pay rate was $13.00 per hour, while Article III of the CBA would have required a new union hire to begin at $10.00 per hour. However, the union had previously negotiated an oral agreement with the union for Stafford McCraey, a former employee who made the same transition from a non-union to a union position within the company. (Scherer Dep., Ex. E hereto, at 23:24-1.)  This agreement provided that the company could transfer employees above the initial hourly rate as long as they did not receive a higher wage than anyone on the seniority list who had not yet received parity. (Scherer Dep. 24:19-25:4.) As such, McCraey started working for the union at a rate of $10.50 per hour, instead of $10.00 per hour, to reflect his prior service with the company.  (Def.'s Stat. of Facts ¶ 12.)

At the time of Plaintiff's request to transfer to the union position, two employees, John Murphy (making $11.00 per hour) and Yvette Simmons (making $10.50 per hour and eligible for an upcoming raise of $.50 per hour) had not reached parity and were on the seniority list. (Def.'s Stat. of Facts ¶ 14.)  Joe Scherer worked with the union to lessen Plaintiff's wage cut and allowed her to start at $11.50 per hour by giving the two more senior employees early raises to

an hourly wage of $11.50 as well. (Def.'s Stat. of Facts ¶ 15.) This was done in accord with Article III and the oral agreement so that Plaintiff would start at a rate which would not surpass the two senior employees.  (Def.'s Stat. of Facts ¶¶ 14-15.)   Plaintiff accepted the night shift position, despite the initial pay decrease.  (Def.'s Stat. of Fact ¶ 16.)

Plaintiff reached parity as of December 1, 2007 (a rate at the time of $19.15 per hour), after two years of progressive increases.  She has continued at the parity rate for forklift operators ever since and after six years of employment, has received 3 weeks of vacation annually.  (Def. Stat. of Facts ¶¶ 17, 21.)

In February 2010, another non-union transfer employee, Michael Volovnik, was transferred from Branch 16 to a union position at the 59th street facility.  Volovnik, a disabled, white male, had been a Peirce-Phelps' employee for about four years at the time of his transfer. No union employees on the seniority list were being paid below parity when Volovnik transferred, and as such, the union did not object to him immediately receiving the parity rate to reflect his prior service to the company.  (Def. Stat. of Facts ¶¶ 19-20.)

On December 3, 2010, Plaintiff filed a grievance alleging wage discrimination, but did not file a charge with the Equal Employment Opportunity Commission regarding the purported discriminatory pay rate until January 25, 2011.  This case was then filed on December 10, 2012. (Def. Stat. of Facts ¶¶ 22-24.)

## II.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of

the record that it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to produce sufficient evidence to allow a reasonable jury to return a verdict in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## III.   PLAINTIFF'S RACE DISCRIMINATION CLAIM

Title VII provides that it is an "unlawful employment practice for an employer to discriminate against any individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex or national origin[.]" 42 U.S.C § 2000e-2(a)(1). Section 1981 prohibits racial discrimination in the making or enforcing of public and private contracts.[5] And the PHRA prohibits discrimination based upon "the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability[.]" 43 P.S. §955(a).  Under each of these statutes, claims based upon circumstantial evidence of discrimination, such as those presented by Plaintiff, are governed by the familiar burden-shifting framework set forth by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999) (stating that Title VII, section 1981, and PHRA claims are analyzed using the McDonnell Douglas burden shifting framework).

---

[5]  Section 1981 provides that "all persons within . . . the United States shall have the same rights in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens[.]"

Under the <u>McDonnell Douglas</u> framework, the plaintiff bears the initial burden of establishing a prima facie case of race discrimination.  <u>Sherrod v. Philadelphia Gas Works</u>, 57 Fed. Appx. 68, 73 (3d Cir. 2003). If plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the unfavorable treatment.  <u>McDonnell Douglas</u>, 411 U.S. at 802. Once the defendant comes forward with such a reason, plaintiff must demonstrate by a preponderance of evidence that the articulated reason was merely a pretext for intentional discrimination.  <u>Id</u>. at 804.

### A.      Prima Facie Case of Discrimination

To make out a prima facie case of race discrimination, Plaintiff must demonstrate that she: (1) is a member of a protected class; (2) was qualified for her position; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated individuals who were not members of the plaintiff's protected class. <u>Blackwell-Murray v. PNC Bank</u>, 963 F. Supp. 2d 448, 462 (E.D. Pa. 2013).  At this level of analysis, the plaintiff is required to produce more than merely speculative evidence of discrimination, but is only required to present enough evidence to create a rebuttable presumption for the defendant to explain. <u>Jones</u>, 198 F.3d at 412; <u>Bullock v. Children's Hosp. of Philadelphia</u>, 71 F. Supp. 2d 482, 490 (E.D. Pa. 1999).

It is undisputed that Plaintiff is a racial minority and that she is qualified for her position at the 59th street warehouse. It is further undisputed that she was transferred to the union position from a non-union position at a lower pay rate than Volovnik, and that he is not a racial minority. (Pl.'s Stat. of Facts ¶¶ 15-18.) We assume, for purposes of this motion, that this is sufficient to raise an inference of discrimination.

**B.**      **Defendant's Legitimate and Nondiscriminatory Reason**

Under the <u>McDonnell Douglas</u> analysis, once a plaintiff has made out a prima facie case of unlawful discrimination, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for why the plaintiff was treated differently. At this stage, defendant's burden is "relatively light" and it need only "introduc[e] evidence which, if taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994). The defendant's evidence is sufficient as long as it rebuts the plaintiff's prima facie case of discrimination with a legitimate explanation, and will allow plaintiff the opportunity to demonstrate pretext. <u>See e.g.</u> <u>Josey v. John. R. Hollingsworth Corp</u>. 996 F.2d 632, 638 (3d. Circ. 1993) (stating economic reasons are an appropriate explanation for this stage of analysis).

To satisfy this burden of production, Defendant offers the testimony of Joe Scherer, Peirce-Phelps' Distribution Manager at the 59th street warehouse. Scherer acknowledged that the CBA between Peirce-Phelps and the union is silent on the pay structure to be used for employees transferred from non-union to union positions within the company. He testified that he worked out an oral agreement with the union to cover such situations[6]:

> Peirce-Phelps would transfer employees at wage rates above the initial hourly rate [provided in the CBA] only if the transferring employee did not receive an hourly rate greater than the hourly rate received by any of the employees already on the seniority list who had not yet receive[d] parity or alternatively, the company agreed to raise the salaries of any more senior employees on the seniority list to ensure that the transferring employee did not receive an hourly rate above that of the more senior employee.

(Scherer Dep. 24:19-25:4.)

---

[6] This agreement was created by Scherer, the President of the union, and two shop stewards. (Scherer Dep., 6:23.)

It appears from the record that Peirce-Phelps had only three occasions to use this policy. It was first established and implemented with the transfer of Stafford McCreay, a non-union employee transferred from a non-union position to a position with the union at the 59th street warehouse. (Scherer Dep., 23:24-24:14.) McCreay had been working for Peirce-Phelps for less than a year at the time of his transfer, and Scherer negotiated with the union to allow McCreay to begin at $10.50 per hour (instead of the $10.00 set out for new hires in Article III of the CBA) to reflect his prior service to the company. (Scherer Dep. 6:22-24.)

The next time this policy applied was with regard to Plaintiff's transition to the union. The policy provided that she was unable to receive parity when transferred from her non-union position because two other employees were on the seniority list waiting to make parity, and she could not be transferred at a rate higher than they were earning. (Scherer Dep., 27:17-21, 28:13-16.) Similar to McCraey, Defendant increased Plaintiff's salary above entry level as dictated in Article III by raising the pay rates of two employees who were more senior than Plaintiff, but who had yet to achieve parity. (Scherer Dep. 9:21-10:10, 14:18-15:23.)

The last employee on record to transfer from a non-union to a union position was Volovnik. At his time of transfer, Volovnik had been working for Peirce-Phelps for roughly four years and no union employees were being paid below parity. Therefore, Peirce-Phelps felt it appropriate that he be transferred at top rate because it reflected his prior service to the company and did not violate any provision of the CBA. (Scherer Dep. 18:7-23, 32:5-10.) The union did not object.

This evidence sufficiently satisfies Defendant's burden of production. We now move to the last step in the McDonnell Douglas analysis, which requires us to determine whether

Plaintiff's evidence, taken as true, would permit a fact-finder to conclude that the agreement with the union was a pretext for racial discrimination.

### C.    Plaintiff's Proof of Pretext

The last step of the McDonnell Douglas analysis requires Plaintiff to satisfy the difficult burden of producing evidence from which a fact-finder could reasonably conclude that Defendant's proffered reasoning is actually a mere pretext for discrimination. Fuentes, 32 F.3d at 763. This can be accomplished by adducing evidence from which a fact-finder could: (1) disbelieve the employer's articulated reasons; or (2) believe that discrimination was more likely than not a motivating or determinative cause of the employer's action. Id. at 764.

### 1.    Discrediting Employer's Proffered Explanation for Using an Informal Policy to Govern Pay Rates when Transferring Employees from a Non-union to a Union Position

Plaintiff has not provided evidence from which a jury could reasonably disbelieve Defendant's explanation. To discredit an employer's reasoning, a plaintiff must "present evidence contradicting the core facts put forth by the employer as the legitimate reasons for its decision." Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005). In other words, the plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Fuentes, 32 F.3d at 765.

Plaintiff offers one reason for rejecting the policy as an explanation: the jury is entitled to disbelieve Defendant's explanation because it is based on an informal, unwritten policy instead of being written into the CBA. (Br. of Pl. at 14.) Plaintiff suggests that this unwritten policy creates an inference of discrimination because it is inconsistent with the level of formality of

most union policies, typically codified in writing. Plaintiff maintains that because the policy covering this "gray" area in the CBA was not in writing, the jury would be permitted to reject it.

The United States Court of Appeals for the Third Circuit has made clear that "the mere fact that a policy is unwritten does not necessarily make it illegitimate." McClement v. Port Auth. Trans-Hudson, 505 Fed. Appx. 158, 162 (3d Cir. 2012); see Coleman v. Blockbuster, Inc., CIV.A. 05-4506, 2008 WL 2622912 (E.D. Pa. 2008) aff'd, 352 Fed. Appx. 676 (3d Cir. 2009) (holding that termination of an employee for violating an unwritten policy is not pretextual because it was applied consistently regardless of race); see also Fitzpatrick v. Duquesne Light Co., 601 F. Supp. 160, 162-63 (W.D. Pa. 1985) aff'd, 779 F.2d 42 (3d Cir. 1985) (holding that removal of the plaintiff for violating the company's unwritten anti-nepotism policy is not pretext for gender discrimination).

We agree with the logic of this precedent because countless decisions employers make are based not on a formal, written policy, but on unwritten, or even intangible, preferences. See Fuentes, 32 F.3d at 765-66 (noting employer's justification for failure to hire included that the candidate "lack[ed] developed interpersonal skills" and "management ability"). That the agreement between Peirce-Phelps and its union was unwritten and addressed a situation that arose infrequently is not enough to survive summary judgment, and Plaintiff has not offered any other reason to suspect that it was a fabrication. See id. at 764 (rejecting the "extreme position[]" that a plaintiff can avoid summary judgment "simply by arguing that the factfinder need not believe the defendant's proffered legitimate explanations").

### 2. Evidence that Discrimination was More Likely Than not a Motivating Factor in Plaintiff's Treatment

We further find that Plaintiff has not presented adequate evidence to suggest that discrimination was a motivating factor in the pay disparity, and therefore, could not satisfy the

second prong of the <u>Fuentes</u> analysis. To survive summary judgment under this prong, the plaintiff must do more than show that the decision was wrong or mistaken. <u>Abramson v. William Paterson Coll. of N.J.</u>, 260 F.3d 265, 283 (3d Cir. 2001). Instead, the plaintiff's evidence must go beyond conclusory statements and beliefs, and must allow a reasonable jury to conclude that unlawful discrimination was the underlying reason for the alleged treatment.  <u>See Vasbinder v. Sec. Dept. of Veterans Affairs</u>, 487 Fed. Appx. 746, 750 (3d Cir. 2012) (holding that proof of "bad blood" between plaintiff and employer was insufficient to survive summary judgment). The plaintiff may prove this by establishing that the defendant has previously discriminated against her or against other members of her protected class, and can use these comparators to create an inference of discrimination. <u>Simpson v. Kay Jewelers, Div. of Sterling, Inc.</u>, 142 F.3d 639, 644-45 (3d Cir. 1998).

Plaintiff cannot satisfy this burden by simply pointing out that Defendant's policy provided a more favorable outcome to Volovnik than to her. Defendant produced evidence to show that this difference was the result of circumstances other than race (namely, the two union employees ahead of Plaintiff on the seniority ladder). Plaintiff's burden at this stage is to show that the difference actually flowed from discrimination.

Plaintiff's only argument on this point is that the jury could draw an inference of discrimination because Peirce-Phelps' supervisors asked Volovnik to transfer to the 59th street warehouse, whereas Plaintiff had to approach her supervisors about the position. (Pl.'s Resp. in Opp'n. at 15.) But this fact is irrelevant to the pretext analysis. <u>See Maull v. Div. of State Police</u>, 39 Fed. Appx. 769, 773-74 (3d Cir. 2002) (holding that evidence of violations of employer policies "unrelated to defendants' justification for their termination decision" were insufficient to survive summary judgment). Plaintiff has offered no explanation of how the circumstances

11

surrounding her awareness of the transfer opportunity would be helpful to a jury trying to evaluate whether an agreement with the union explained her initial pay rate following the transfer. The mere fact that Plaintiff was not offered the transfer until she asked for it neither suggests unlawful discrimination, nor casts doubt on the credibility of Defendant's agreement with the union. Accordingly, it is insufficient to survive summary judgment.

**IV.   <u>CONCLUSION</u>**

We hold that Plaintiff is unable to survive the <u>McDonnell Douglas</u> burden shifting analysis because she cannot satisfy the burden of discrediting Defendant's nondiscriminatory explanation for her treatment. For the foregoing reasons, Defendant's motion for summary judgment will be granted. Our order follows.